## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| RYAN SHEAHEN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>SPARTON CORPORATION, JAMES R. SWARTWOUT, JOSEPH J. HARTNETT, DAVID P. MOLFENTER, JAMES DALE FAST, CHARLES R. KUMMETH, FRANK ANDERS WILSON, ALAN L. BAZAAR, and JOHN A. JANITZ,<br><br>Defendants. | Civil Case No.: 1:17-cv-1742<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**Judge** |

## CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934

Plaintiff Ryan Sheahen ("Plaintiff"), on behalf of himself and the proposed Class defined herein, brings this class action suit for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934. In support of this Class Action Complaint, Plaintiff, by his attorneys, alleges upon information and belief, except for his own acts, which are alleged on knowledge, as follows:

### NATURE OF THE ACTION

1.      Plaintiff brings this action on behalf of himself and the public stockholders of Sparton Corporation ("Sparton" or the "Company") against the Company and Sparton's Board of Directors (collectively, the "Board" or the "Individual Defendants," as further defined below) for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 14a-9 promulgated thereunder ("Rule 14a-9").

2.      On July 7, 2017, Ultra Electronics Holdings plc ("Ultra") and the Company

announced that they had entered into an Agreement and Plan of Merger ("Merger Agreement") pursuant to which Ultra will acquire all of the outstanding shares of Sparton for $23.50 per share in cash (the "Proposed Transaction"). Pursuant to the terms and subject to the conditions set forth in the merger agreement, should Sparton stockholders vote in favor of the Proposed Transaction, Ultra Electronics Aneira Inc., an indirect wholly owned subsidiary of Ultra ("Merger Sub"), will be merged with and into Sparton so that the Company will be the surviving corporation in the merger and an indirect wholly owned subsidiary of Ultra. The Proposed Transaction is valued at approximately $235 million.

3.     On August 4, 2017, defendants issued materially incomplete and misleading disclosures in the Schedule 14A Proxy Statement (the "Proxy Statement") filed with the United States Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction. The Proxy Statement is deficient and misleading in that it fails to provide adequate disclosures of all material information related to the Proposed Transaction.

4.     Accordingly, Plaintiff alleges herein that Defendants have violated Sections 14(a) and 20(a) of the Exchange Act in connection with the filing of the Proxy Statement. Plaintiff seeks to enjoin the stockholder vote on the Proposed Transaction unless and until such Exchange Act violations are cured.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, pursuant to 15 U.S.C. § 78aa (federal question jurisdiction), as Plaintiff alleges violations of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

6.     The Court has personal jurisdiction over each of the Defendants because each either is a corporation that is incorporated under the laws of, conducts business in and maintains operations in this District or is an individual who either is present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because: (a) one or

more of the Defendants either resides in or maintains executive offices here; (b) a substantial portion of the transactions and wrongs complained of herein occurred here; and (c) Defendants have received substantial compensation and other transfers of money here by doing business here and engaging in activities having an effect here.

## PARTIES

8.      Plaintiff is, and has been at all relevant times, the owner of shares of Sparton common stock.

9.      Defendant James R. Swartwout ("Swartwout") has served as a director and Chairman of the Board since 2008.

10.     Defendant Joseph J. Hartnett ("Hartnett") has served as the Interim President and Chief Executive Officer of the Company since February 2016. He has served as a director of Sparton since 2008.

11.     Defendant David P. Molfenter ("Molfenter") has served as an independent director of Sparton since 2000.

12.     Defendant James Dale Fast ("Fast") has served as an independent director of Sparton since 2001.

13.     Defendant Charles R. Kummeth ("Kummeth") has served as an independent director of Sparton since 2011.

14.     Defendant Frank Anders Wilson ("Wilson") has served as an independent director of Sparton since 2015.

15.     Defendant Alan L. Bazaar ("Bazaar") has served as an independent director of Sparton since 2016.

16.     Defendant John A. Janitz ("Janitz") has served as an independent director of Sparton since 2016.

17.     Defendants Swartwout, Hartnett, Molfenter, Fast, Kummeth, Wilson, Bazaar, and Janitz are collectively referred to herein as the "Board" or the "Individual Defendants."

3

18.     Defendant Sparton is an Ohio corporation, is a provider of design, development and manufacturing services for complex electromechanical devices, as well as sophisticated engineered products complementary to the same electromechanical value stream. The Company and maintains its principal offices at 425 North Martingale Road, Suite 1000, Schaumburg, Illinois 60173. Sparton's common stock is traded on the New York Stock Exchange under the symbol "SPE."

19.     The Individual Defendants and Sparton are referred to collectively herein as "Defendants."

## OTHER RELEVANT ENTITIES

20.     Ultra, organized under the laws of England and Wales, is a defense, security, transport and energy company. Ultra applies electronic and software technologies in military applications, safety-critical devices in aircraft, nuclear controls and sensor measurement, among other environments.

21.     Merger Sub is an Ohio corporation and an indirect wholly owned subsidiary of Ultra. Merger Sub was incorporated on July 3, 2017 for the sole purpose of effecting the merger. As of the date of this proxy statement, Merger Sub has not conducted any activities other than those incidental to its incorporation, the negotiation and execution of the merger agreement and the transactions contemplated by the merger agreement.

## CLASS ACTION ALLEGATIONS

22.     Plaintiff brings this action individually and as a class action on behalf of all holders of Sparton stock who are being, and will be, harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to, controlled by, or affiliated with, any Defendant, including the immediate family members of the Individual Defendant.

23.     This action is properly maintainable as a class action under Federal Rule of Civil Procedure 23.

24.     The Class is so numerous that joinder of all members is impracticable. As of May 5, 2017, there were approximately 9,860,635 shares of common stock outstanding. These shares are held by thousands of beneficial holders who are geographically dispersed across the country.

25.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include, inter alia, the following:

     (a)     Whether defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

     (b)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

     (c)     Whether Plaintiff and the other members of the Class would suffer irreparable harm were the Proposed Transaction consummated.

26.     Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

27.     Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature, and will fairly and adequately protect the interests of the Class.

28.     The prosecution of separate actions by individual members of the Class creates a risk of inconsistent or varying adjudications with respect to individual members of the Class, which could establish incompatible standards of conduct for Defendants.

29.     Plaintiff anticipates that there will be no difficulty in the management of this litigation. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

30.     Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class a whole.

31.     Accordingly, Plaintiff seeks injunctive and other equitable relief on behalf of himself and the Class to prevent the irreparable injury that the Company's stockholders will

continue to suffer absent judicial intervention.

## FACTUAL BACKGROUND

### *Company Background and Strong Financial Outlook*

32.     Sparton is a provider of design, development and manufacturing services for complex electromechanical devices, as well as sophisticated engineered products complementary to the same electromechanical value stream. The Company serves the Medical & Biotechnology, Military & Aerospace and Industrial & Commercial markets through two reportable business segments; Manufacturing & Design Services ("MDS") and Engineered Components & Products ("ECP"). The majority of the Company's customers are in highly regulated industries where strict adherence to regulations is necessary.

33.     The Company's products and services include offerings for Original Equipment Manufacturers and Emerging Technology customers that utilize microprocessor-based systems which include transducers, printed circuit boards and assemblies, sensors and electromechanical components, as well as development and design engineering services relating to these product sales. The Company also develops and manufactures sonobuoys, anti-submarine warfare devices used by the United States Navy as well as by foreign governments that meet Department of State licensing requirements. Additionally, the Company manufactures rugged flat panel display systems for military panel PC workstations, air traffic control and industrial applications, as well as high performance industrial grade computer systems and peripherals.

34.     On September 6, 2016, Sparton reported its fourth quarter and fiscal year 2016 results (the "Fiscal Year 2016 Annual Report").

35.     The Fiscal Year 2016 Annual Report states in pertinent part:

**Organic Growth and New Business Development**
Fiscal 2016 marked a pivotal year for Sparton in establishing positive momentum toward sustainable organic revenue growth. We improved the quality of our sales force and pipeline, introduced effective new sales tools, and refined our sales metrics in order to objectively measure our performance. These efforts resulted in significant progress towards our goal to achieve year-over-year net organic growth. Our MDS segment closed the year with backlog of $139 million which included

6

$61 million in new program wins for the fiscal year. The Engineered Components and Products (ECP) segment closed the fiscal year with backlog of $142 million, principally made up of $117 million in domestic sonobuoys, $6 million in foreign sonobuoys and $14 million in rugged displays.

**Operating Performance**

Our revenues for the year were $419 million, a $37 million increase over the prior year. Gross margins and operating margins were lower than the prior year due in large part to the impact of integrating the prior year's acquisitions and costs associated with the strategic review process and the exploration of a potential sale. Improving margins and reducing costs have been a significant focus in the latter half of Fiscal 2016 and that focus will continue throughout Fiscal 2017.

**Cash Flow and Debt**

Fiscal 2016 produced $42 million in free cash flow resulting in an outstanding debt balance under our credit facility of $97 million, a $57 million reduction from the prior year's balance. Additionally, we amended our credit facility to reduce maximum borrowings and related costs to reflect our lower borrowing needs and to provide for additional flexibility in our financial covenants. Our amended credit facility now provides for maximum borrowings of $175 million. There is no doubt that we faced many challenges during Fiscal 2016. However, we have closed the year with robust backlog, made significant progress in improving our operating performance and cash flows, reduced debt below $100 million and have continued to take the steps necessary to reduce our corporate operating expenses. With a With a Company-wide commitment to drive out overhead expense and our strong new business development momentum, we look forward to Fiscal 2017.

36.     Although Sparton was unabashedly open about the prospect of a strategic transaction, these positive financial results show a Company well positioned to turn itself around and enjoy success as a standalone entity. However, despite these strong results, the Individual Defendants caused the Company to enter into the Merger Agreement, pursuant to which the Company will be acquired for inadequate consideration.

***Sparton's Relationship with Ultra***

37.     Sparton DeLeon Springs, LLC ("SDS"), a subsidiary of the Company, and UnderSea Sensor Systems, Inc., a subsidiary of Ultra ("USSI") are parties to a joint venture agreement under which SDS and USSI are 50/50 partners in a joint venture (the "ERAPSCO JV"). The ERAPSCO JV allows Sparton and USSI to combine their own unique and complementary backgrounds to jointly develop and produce U.S. derivative sonobuoy designs for the U.S. Navy as well as for foreign governments that meet Department of State licensing requirements. Pursuant

to the ERAPSCO agreement, Ultra and Sparton are restricted from certain transfers of their respective interests in the ERAPSCO JV, unless the party seeking to make such a transfer first offers the other party the opportunity to purchase such interest (the "ERAPSCO transfer provisions").

***The Sale Process***

38.     The story of this merger traces its origins to a long and convoluted sales process that saw Sparton contact over a hundred separate entities over a two year period in the interest of pursuing a potential strategic transaction.

39.     Beginning in late 2015, the Board took a number of steps towards the pursuit of a strategic transaction. On September 2, 2015, the Company board held a telephonic meeting at which, as a result of its review of Sparton's strategic growth plan for 2015 through 2020, and in light of the possibility that the Company was an acquisition target, the Board created a special committee of independent directors of the Company board (the "Special Committee"). Furthermore, following a lengthy review process, Wells Fargo Securities ("Wells Fargo") was retained as the Special Committee's financial advisor on December 31, 2015.

40.     As part of these efforts, and in light of the parties' relationship pursuant to the ERAPSCO JV, on February 8, 2016, Rakesh Sharma, Chief Executive of Ultra, spoke with Defendant Swartwout regarding Ultra's interest in a potential acquisition of the Company's sonobuoy business.

41.     However, Ultra wasn't the only entity interested in a potential strategic transaction with Sparton. Accordingly, in order to better facilitate and control the sale process, on March 8, 2016, the Board, acting on the recommendation of the Special Committee, established a new committee (the "Process Committee") with the authority, among other things, to negotiate and execute non-disclosure, standstill, and other preliminary agreements and to negotiate purchase agreements, merger agreements and other applicable definitive transaction agreements, except that the Process Committee would not have the power or authority to authorize the Company to enter into any sale or other business combination transaction or any agreement obligating the Company

8

to consummate any such transaction.

42.     On March 16, 2016, the Company issued a press release announcing that the Board had been exploring strategic alternatives, with the goal of identifying the best way to enhance shareholder value. That same day, the Company informed Ultra that it desired to commence discussions with Ultra in connection with a potential transaction and would like to provide confidential information to Ultra to facilitate those discussions.

43.     Throughout the remainder of March and the entire month of April, the parties negotiated the terms of the non-disclosure agreement, and on May 9, 2016, Ultra Electronics Limited, a subsidiary of Ultra, and the Company entered into a non-disclosure agreement.

44.     In addition to Ultra, over the next several months, the Process Committee and Wells Fargo spoke with 83 strategic buyers and 101 financial buyers regarding a strategic transaction. These efforts resulted in 23 strategic buyers and 50 financial buyers executing non-disclosure agreements and receiving a confidential information package ("the CIP").

45.     On July 12, 2016, Wells Fargo Securities received initial indications of interest from seven strategic buyers, including Ultra, and 14 financial buyers.

46.     After a review and discussion with the assistance of representatives of Wells Fargo Securities, the process committee directed that the 13 potential buyers, including Ultra, that had proposed the highest values be invited to participate in the next stage of the marketing process, which would include management presentations.

47.     From July 25, 2016 through August 12, 2016, Defendant Hartnett and other senior management of the Company gave 16 management presentations at the Company's corporate headquarters to the potential buyers, including Ultra, who had advanced to the next stage of the process. Furthermore, on August 12, 2016, Wells Fargo Securities sent to the 15 potential buyers still participating in the marketing process a letter requesting the submission, by August 19, 2016, revised indications of interests to acquire the entire Company or one of its business segments.

48.     From August 19 through August 23, 2016, Wells Fargo Securities received revised indications of interest from four strategic buyers, including Ultra, and seven financial buyers.

Ultra's revised indication of interest contained a proposal to acquire the entire Company at a price of $26.00 per share of Company common stock, contingent upon a sale of MDS for $145 million. Additionally, Ultra stated in its revised indication of interest that it reserved its rights under the ERAPSCO transfer provisions. In addition to the revised indication of interest from Ultra, Party C also submitted a proposal to acquire the entire Company at a price of $26.00 per share of Company common stock, and Party B submitted a proposal to acquire the entire Company at a price range of $26.00 to $28.00 per share of Company common stock. Party B's revised indication of interest also contained a proposal to acquire the Company's ECP business segment for $250 million, on a cash-free, debt-free basis. No additional information is provided regarding the eight additional indications of interest that the Company received.

49.     In addition to the above referenced offers, on August 24, 2016, Wells Fargo Securities received a revised indication of interest for the acquisition of ECP for a price ranging from $200 million to $220 million, on a cash-free, debt-free basis. Furthermore, on August 30, 2016, Wells Fargo Securities received a revised indication of interest for the acquisition of MDS for $100 million, on a cash-free, debt-free basis. No additional information is provided regarding these offers.

50.     On October 8, 2016, Ultra informed Sparton that Ultra was no longer pursuing a strategic transaction with the Company, but that, given the ERAPSCO JV relationship, Ultra would like for the Company to provide an opportunity for representatives of Ultra to meet with representatives of any potential buyer of the Company or ECP prior to the Company entering into a definitive transaction agreement with such potential buyer.

51.     On October 19, 2016, the Process Committee held a telephonic meeting wherein a representative of Wells Fargo Securities updated the Process Committee on the status of the marketing process, noting that the number of potential buyers in the process had decreased from ten to four, with Party B and Party C appearing to be the potential buyers most interested in pursuing a potential strategic transaction with the Company. In light of Party B being one of only two serious bidders remaining in the marketing process, Wells Fargo notified the Process

Committee that (i) Wells Fargo Securities or an affiliate of Wells Fargo Securities is the lead bank for the current credit facility of a subsidiary of Party B and (ii) Wells Fargo Securities or an affiliate of Wells Fargo Securities is a participant in the current credit facility of a consultant that has been advising Party B in its evaluation of a strategic transaction with the Company and that might also provide equity financing to Party B in connection with any such transaction. This potential conflict of interest was further discussed by the Board on November 2, 2016, at which time the Board decided to retain a second financial advisor to assist it in the exploration of strategic alternatives

52.  On November 15, 2016, Party C submitted a proposal to acquire the entire Company for $26.25 per share of Company common stock. The proposal contained a detailed list of due diligence requests and a letter from a national investment bank stating that it was "highly confident" that an acquisition of the Company could be financed in the then-current debt markets. Party C's proposal also contained a mark-up of the merger agreement.

53.  On November 17, 2016, Party B submitted a proposal to acquire the entire Company for $21.50 per share of Company common stock. The proposal contained a detailed list of due diligence requests and requested a meeting with Ultra to discuss the ERAPSCO JV and agree on maintaining the ERAPSCO JV without material change through 2023. Party B also requested exclusivity with the Company for 30 days and included in its proposal a form of the exclusivity agreement it was prepared to execute.

54.  In light of Party B being one of only two bidders remaining in the marketing process, on November 18, 2016, with the approval of the Board, the Company entered into an agreement with Raymond James for Raymond James to serve as a second financial advisor to advise the Company board in evaluating potential strategic alternatives available to the Company, including the marketing process, and provide a fairness opinion in the event the Company board decides to pursue a strategic transaction.

55.  During a telephonic meeting of the Process Committee, on November 22, 2016, the committee decided to pursue a potential acquisition of the Company by Party C and, to that end, seek to arrange a meeting with representatives of the Company and Ultra and Party C, respectively.

11

Furthermore, the committee requested that Wells Fargo Securities and Raymond James continue to encourage Party B to make a more competitive proposal.

56.     Discussions between Party C and Ultra occurred throughout the month of December, and on December 26, 2016, Party C chose to revise its November 15, 2016 proposal, following clarification from Ultra regarding the future conduct of the ERAPSCO JV in the event Party C were to acquire the Company. Specifically, Party C's revised proposal reduced the consideration in its proposal to acquire the entire Company from $26.25 to $23.50 per share of Company common stock. In light of this reduced proposal, the Process Committee elected to continue discussions with both Party B and Party C, and to further facilitate discussions between the relevant entities and Ultra.

57.     In January 2017, Ultra communicated to Sparton that while Party C would be an acceptable joint venture partner for Ultra, in the event that Party C were to acquire the Company, Ultra would not be comfortable with Party B as a joint venture partner in the ERAPSCO JV due to the fact that Ultra and Party B are competitors in markets other than sonobuoys.

58.     On February 1, 2017, Wells Fargo Securities and Raymond James sent to Party B and Party C, a process letter requesting final proposals by February 6, 2017. This letter was also sent to two additional entities that had recently joined the process, Party E and Party F.

59.     On February 6, 2017, Party B submitted a proposal to acquire the Company for $24.50 per share of Company common stock and reiterated its request for exclusivity with the Company for 30 days. Additionally, Party C submitted a proposal to acquire the Company for $24.00 per share of Company common stock and also requested exclusivity with the Company for 30 days. Neither Party E nor Party F submitted a final proposal.

60.     In the Spring of 2017, as negotiations between Sparton and various interested strategic acquirors continued to move forward, Ultra again expressed concern regarding its ability to work with these various entities.

61.     On March, 7, 2017, Ultra sent a letter to the Company stating, among other things, that Ultra will not be a party to a joint venture agreement with Party B in any form or manner other

than honoring Ultra's obligations following termination. The letter went on to state that if the acquirer is Party B, Ultra would serve notice of its decision to terminate the ERAPSCO agreement.

62.     One month later, Ultra also soured on Party C. On April 5, 2017, Sparton learned that, based on discussions between Ultra and Party C, Party C believed that Ultra was of the view that Party C would not be acceptable joint venture partners and that Ultra would not be a cooperative partner with Party C in the ERAPSCO JV in the event of an acquisition of the Company.

63.     In light of Ultra's reluctance to work with these entities, on April 11, 2017, at the request of the Company's board, a representative of Wells Fargo Securities spoke with Ultra regarding a potential acquisition of the Company by Ultra. Ten days later, on April 21, 2017, Ultra sent an indication of interest to Wells Fargo Securities to acquire the Company for $23.50 per share of Company common stock.

64.     On May 10, 2017, the Company and Ultra executed an exclusivity agreement providing for exclusivity through June 7, 2017.

65.     On May 31, 2017, a representative of Wells Fargo Securities received an email from an individual representing a publicly listed supplier of aerospace and defense products and systems ( "Party G") seeking to make a proposal to acquire the Company. The Company proceeded to notify Ultra of the receipt of this communication in accordance with the terms of the exclusivity agreement. Shortly thereafter, on June 6, 2017, Party G sent to a representative of Wells Fargo Securities a non-binding proposal to acquire the Company for $22.00 to $24.00 per share of Company common stock. In accordance with the terms of the exclusivity agreement, the Company notified Ultra of the receipt of this communication and provided Ultra a copy of the proposal.

66.     On June 26, 2017, Ultra sent to the Company its final offer to acquire the Company for $22.35 per share of Company common stock. Disappointed by the offer, the Process Committee held a telephonic meeting, during which time the process committee instructed Wells Fargo Securities and Raymond James to engage with Ultra's financial advisors to seek to obtain a per share price for Company common stock of at least $23.50.

67.     Ultra signaled its agreement to the per share price for Company common stock of $23.50 when, on June 30, 2017, Ultra's representatives sent to Wells Fargo Securities a final "package deal" reflecting a revised final offer to acquire the Company for $23.50 per share of Company common stock, which was contingent on the Company accepting Ultra's position on four major open points in the merger agreement: (i) Ultra would have no obligation to make any divestitures or agree to any restrictions on its business in connection with obtaining governmental approvals for the transaction and Ultra would have no obligation to litigate if a governmental authority filed suit challenging the transaction, (ii) the amount of the termination fees payable by the Company or Ultra in certain circumstances would each be $7.5 million, (iii) the Ultra board of directors would have no obligation to hold a meeting of the Ultra shareholders to vote on the approval of the transaction if the Ultra board of directors shall have changed its recommendation that Ultra shareholders should vote to approve the transaction and (iv) Ultra would not be required to hold the Ultra shareholders meeting by a date certain specified in the merger agreement.

68.     The Company's board accepted the four positions in Ultra's package deal on July 1, 2017, and from July 2, 2017 through July 6, 2017, the parties finalized the terms of the merger agreement and disclosure schedules.

69.     On July 5, 2017, the Company board held a telephonic meeting at which representatives of Wells Fargo Securities, Raymond James and Mayer Brown were present to, among other things, consider the proposed merger with Ultra at a price of $23.50 per share of Company common stock.

70.     On July 6, 2017, the Company board held a telephonic meeting to, among other things, consider the proposed merger with Ultra. The Company board then unanimously (a) determined that the merger agreement and the transactions contemplated by the merger agreement, including the merger, are fair to the Company shareholders and are in the best interests of the Company and the Company shareholders, (b) authorized, declared advisable and approved the merger agreement and the transactions contemplated by the merger agreement, including the merger, (c) directed that the adoption of the merger agreement be submitted to a vote at a meeting

of the Company shareholders and (d) resolved to recommend that the Company shareholders adopt the merger agreement.

71.     Early in the morning of July 7, 2017, the Company, Ultra and Merger Sub executed the merger agreement and the Company issued a press release announcing entry into the merger agreement prior to the opening of trading on the NYSE that morning.

***The Proposed Transaction***

72.     In a joint press release dated Jul 7, 2017, Sparton and Ultra announced that they had entered into the Merger Agreement.

73.     The press release states in pertinent part:

Schaumburg, Ill. — (BUSINESS WIRE) — Jul. 7 2017 — Sparton Corporation (NYSE: SPA) ("Sparton") announced today that it had entered into a merger agreement with Ultra Electronics Holdings plc (LSE: ULE) ("Ultra"), pursuant to which Ultra will acquire Sparton for $23.50 per share in cash.

"This transaction is the result of the significant time and effort the Company has invested in its previously announced process to explore strategic alternatives, including a potential acquisition of Sparton," said Joseph J. Hartnett, Interim President & Chief Executive Officer of Sparton. "We are pleased to have successfully concluded our process with a transaction that delivers significant value to the shareholders of Sparton."

The Board of Directors of Sparton unanimously approved the transaction. The transaction is subject to customary closing conditions, including regulatory clearances and approval of Sparton's and Ultra's respective shareholders, and is expected to close no later than January 1, 2018.

Additional details regarding the transaction will be set forth in a proxy statement that will be sent by Sparton to its shareholders in advance of the special meeting at which Sparton's shareholders will be asked to approve the transaction.

Wells Fargo Securities, LLC and Raymond James & Associates, Inc. acted as financial advisors to Sparton. Mayer Brown LLP acted as legal counsel to Sparton. California.

***The Proxy Statement Misleads Sparton Stockholders by Omitting Material Information***

74.     On August 4, 2017, Defendants filed, or caused to be filed, a materially incomplete and misleading Proxy Statement with the SEC and disseminated it to Sparton stockholders.  The

15

Proxy Statement misrepresents or omits material information that is necessary for the Company's stockholders to make an informed decision whether to vote in favor of the Proposed Transaction.

75.     Specifically, as set forth below, the Proxy Statement fails to provide Company stockholders with material information or provides them with materially misleading information concerning: (i) the nondisclosure agreements entered into with various potential strategic partners; (ii) the Company's financial projections; (iii) the valuation analyses prepared by Wells Fargo and Raymond James in connection with the rendering of its fairness opinion; and (iv) conflicts of interest involving Sparton's financial advisors. Accordingly, Sparton stockholders are being asked to vote for the Proposed Transaction without all material information at their disposal.

***Material Omissions Concerning Nondisclosure Agreements***

76.     With regard to the omission of material information relating to the sale process leading up to the Proposed Transaction, the Proxy Statement states that the Company entered into a nondisclosure agreements with a number of strategic partners to facilitate the discussion of various potential strategic opportunities. As part of the marketing process, at least 23 strategic buyers and 50 financial buyers entered into non-disclosure agreements with Sparton.

77.     However, details regarding the nature of the non-disclosure agreements are worryingly absent from the Proxy Statement. Specifically, the Proxy Statement fails to disclose whether these agreements contained standstill provisions that are still in effect and/or "don't-ask-don't-waive" standstill provisions that are presently precluding these industry participants from making a topping bid for the Company. Without this information, the Company's stockholders are being misled into assuming that these other industry participants, which were actively interested in acquiring the Company, could make an offer to acquire the Company if they so choose – when they may be contractually precluded from doing so.

78.     The likelihood of these industry participants being currently precluded by a "don't-ask-don't-waive" standstill from making a topping bid for the Company is corroborated by the Non-Solicitation provision of the Merger Agreement, which forbids Sparton from waiving any

standstill agreements, unless the Sparton Board were to find that it would be a breach of fiduciary duty for it to fail to waive it. Such a provision would serve no purpose unless Sparton had entered into a standstill agreement with other interested parties that served to preclude them from making a topping bid for the Company.

79.     The omission of this information renders certain portions of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act including, *inter alia*, the following sections of the Proxy Statement: (i) "Background of the Merger"; and (ii) "Recommendation of the Company Board of Directors; Reasons for the Merger."

### *Material Omissions Concerning Sparton's Financial Projections*

80.     The Proxy Statement fails to disclose material information concerning the financial projections for both the Company that were relied upon by the Board and the Company's financial advisors in recommending the Proposed Transaction to Sparton stockholders.

81.     Here the Proxy Statement provides five non-GAAP accounting metrics for projected financial information over the years 2017-2022: EBITDA, Adjusted EBITDA, Management EBITDA, Unlevered, after-tax free cash flow ("UFCF"), and Adjusted diluted earnings per share. Although the Proxy Statement describes the various adjustments that were made to these non-GAAP measures and how they were calculated, it fails to disclose the line item projections for the calculations, or otherwise reconcile these non-GAAP projections to the most comparable GAAP measure for each.

82.     Providing these non-GAAP metrics without disclosing the line item metrics used to calculate them, or otherwise reconciling the non-GAAP projections to GAAP measures, makes the provided disclosures materially incomplete and misleading.  Non-GAAP measures have no universally understood definition and vary widely between companies depending on the needs of management in promoting their own effect on Company performance.  Rather than disclose the information necessary to reconcile these measures, Defendants chose to omit this information.

83.     Consequently, the Proxy Statement provides Sparton stockholders with a number of non-GAAP financial projections that make it extremely difficult for stockholders to assess the

fairness of the Proposed Transaction. This is particularly problematic for Sparton stockholders. Because of the non-standardized and potentially manipulative nature of non-GAAP measures, the SEC requires the disclosure of certain information in solicitation materials. Thus, when a company discloses information in a Recommendation Statement that includes non-GAAP financial measures, as is the case here, the Company must also disclose comparable GAAP measures and a quantitative reconciliation of forward-looking information. 17 C.F.R. § 244.100. Item 10(e)(1)(i)(B) of SEC Regulation S-K further states that, with regard to forward-looking information such as financial projections, *any* reconciling metrics that are available without unreasonable efforts must be disclosed. 17 C.F.R. 229.10(e)(1)(i)(B). Consequently, without disclosure of these reconciling metrics, the Recommendation Statement violates SEC regulations and materially misleads Sparton stockholders.

84.    The omission of this information renders certain portions of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act including, *inter alia*, the following sections of the Proxy Statement: (i) "Opinion of Raymond James & Associates, Inc."; (ii) "Opinion of Wells Fargo Securities, LLC"; (iii) Unaudited Prospective Financial Information"; and (iv) "Background of the Merger."

### *Material Omissions Concerning Wells Fargo's and Raymond James' Financial Analyses*

85.    The Proxy Statement describes Wells Fargo's and Raymond James' respective fairness opinion and the various valuation analyses it performed in support of their opinions. However, the description of Wells Fargo's and Raymond James' fairness opinions and the underlying analyses fails to include key inputs and assumptions underlying these analyses. Without this information, as described below, Sparton public stockholders are unable to fully understand these analyses and, thus, are unable to determine what weight, if any, to place on either Wells Fargo's and Raymond James' fairness opinions in determining whether to vote in favor of the Proposed Transaction.  This omitted information, if disclosed, would significantly alter the total

mix of information available to Sparton stockholders.

86.     Specifically, the Proxy Statement fails to disclose various material elements of the financial analyses performed by Wells Fargo and Raymond James.  For example, Wells Fargo and Raymond James each performed a *Selected Companies Analysis*, which was presented to the Board, yet the Proxy Statement fails to disclose the individual multiples and financial metrics for the companies identified in Wells Fargo's and Raymond James' respective analyses.

87.     Similarly, Wells Fargo and Raymond James each performed a *Selected Transaction Analysis,* which was also presented to the Board, however, the Proxy Statement fails to disclose the individual multiples and financial metrics for the transactions observed by Wells Fargo and Raymond James.

88.     Furthermore, Wells Fargo and Raymond James each performed a *Discounted Cash Flow Analysis,* which was also presented to the Board.  With regard to Wells Fargo's and Raymond James' respective analyses, the Proxy Statement fails to disclose: (i) the projected free cash flows of the Company used by Wells Fargo and Raymond James in their respective analysis; (ii) the constituent line items Wells Fargo and Raymond James used in calculating unlevered free cash flow; (iii) the estimated terminal value of the Company as calculated by Wells Fargo and Raymond James; (iv) the Company's net debt; and (v) the inputs and assumptions underlying the discount rate range selected by the respective financial advisors.

89.     When a bankers' endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and range of ultimate values generated by those analyses must also be fairly disclosed. Furthermore, the disclosure of projected financial information provides stockholders with a basis to project the future financial performance of a company, and allows stockholders to better understand the financial analyses performed by the company's financial advisor in support of its fairness opinion. This information is therefore material, and must be disclosed if Sparton stockholders are to make a fully informed decision.

90.     Without such undisclosed information, Sparton stockholders cannot evaluate for

themselves whether the financial analyses performed by Wells Fargo and Raymond James were based on reliable inputs and assumptions or whether they were prepared with an eye toward ensuring that a positive fairness opinion could be rendered in connection with the Proposed Transaction. In other words, full disclosure of the omissions identified above is required in order to ensure that stockholders can fully evaluate the extent to which Wells Fargo's and Raymond James' opinion and analyses should factor into their decision whether to vote in favor of or against the Proposed Transaction.

91. The omission of this information renders certain portions of the Proxy Statement false and/or materially misleading in contravention of the Exchange Act including, *inter alia*, the following sections of the Proxy Statement: (i) "Opinion of Raymond James & Associates, Inc."; and (ii) "Opinion of Wells Fargo Securities, LLC."

### Material Omissions Concerning Wells Fargo's and Raymond James' Potential Conflicts of Interest

92. Finally, the Proxy Statement fails to disclose material information concerning the potential conflicts of interest faced by Wells Fargo and Raymond James in acting as the Company's financial advisors.

93. Specifically, the Proxy Statement fails to disclose whether Wells Fargo performed work for Sparton or Ultra in the last two years, and if so, the compensation it received for such work.

94. The Proxy Statement also fails to disclose whether Raymond James performed work for Ultra in the last two years, and if so, the compensation it received for such work.

95. Full disclosure of investment banker compensation and all potential conflicts is necessary due to the central role played by investment banks in the evaluation, exploration, selection, and implementation of strategic alternatives. Omission of such conflicts of interests renders the statements made concerning the bankers' fairness opinions misleading.

96. The omission of this information renders the certain portions of the Proxy

Statement false and/or materially misleading in contravention of the Exchange Act including, *inter alia*, the following sections of the Proxy Statement: (i) "Opinion of Raymond James & Associates, Inc."; and (ii) "Opinion of Wells Fargo Securities, LLC"

97.     Based on the foregoing, Sparton public shareholders lack critical information necessary to evaluate whether the Proposed Transaction truly maximizes shareholder value and serves their interests. Moreover, without the key financial information and related disclosures, Sparton public shareholders cannot gauge the accuracy and reliability of the financial analyses performed by Raymond James and Wells Fargo, and whether they can reasonably rely on their respective fairness opinions.

98.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## FIRST CAUSE OF ACTION
### Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9 Promulgated Thereunder

99.     Plaintiff repeats and realleges each allegation set forth herein.

100.     As detailed herein, Defendants disseminated the false and misleading Proxy Statement specified above, which contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct earlier statements which had become false or misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

101.     By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations in respect of the common stock of Sparton.

102.    By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy Statement. The Proxy Statement was prepared, reviewed, and/or disseminated by Defendants. The Proxy Statement misrepresented and omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Proxy Statement with these materially false and misleading statements and omissions. Defendants have also failed to correct the Proxy Statement and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

103.    The omissions and false and misleading statements in the Proxy Statement are material in that a reasonable stockholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statement and in other information reasonably available to stockholders.

104.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which defendants' actions threaten to inflict.

### SECOND CAUSE OF ACTION
**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

105.    Plaintiff repeats and realleges each allegation set forth herein.

106.    The Individual Defendants acted as controlling persons of Sparton within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of Sparton and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the

Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

107.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy Statement and other statements alleged by Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

108.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Proxy Statement at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

109.    In addition, as the Proxy Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy Statement purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the Individual Defendants.

110.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

111.    Plaintiff has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants as follows:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as a representative of the Class, and appointing his counsel as class counsel;

B.      Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain the best available terms for shareholders;

C.      Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.      Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the wrongdoing;

E.      Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Dated:  August 18, 2017

By:   /s/ John C. Camillus
_____
John C. Camillus
Law Offices of John C. Camillus, LLC
P.O. Box 141410
Columbus, OH 43214
Telephone: (614) 558-7254
Email: jcamillus@camilluslaw.com

*Attorneys for Plaintiff*

Of Counsel:

LEVI & KORSINSKY, LLP
Donald J. Enright
Elizabeth K. Tripodi
1101 30th Street, NW
Suite 115
Washington, DC 20007
Telephone: (202) 524-4290
Facsimile: (202) 333-2121